

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 7, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 22-30493-sgj7** |
| **DOMINIQUE LYDELL MADDOX,** | § | (Chapter 7) |
|     Debtor. | § | |

| | | |
|---|---|---|
| **WE SELL RESTURANTS, INC.,** | § | |
|     Plaintiff, | § | |
| | § | |
| **vs.** | § | |
| | § | **ADVERSARY NO. 22-03063** |
| **DOMINIQUE LYDELL MADDOX,** | § | |
|     Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT
## OF NONDISCHARGEABILITY, PURSUANT TO 11 U.S.C. § 523(a)(6)

1

CAME ON FOR TRIAL before this court, on May 15, 2023, the above-referenced Adversary Proceeding (herein so called) in which Plaintiff seeks a determination of nondischargeability of a debt owed to it by the Chapter 7 Debtor, pursuant to section 523(a)(2), (4), and (6) of the Bankruptcy Code.  Plaintiff is a national brokerage firm that retained the Debtor prepetition as an independent contractor.  The parties' relationship was terminated by the Plaintiff, and prepetition litigation ensued regarding the Debtor's alleged misappropriation of customers/clients and proprietary information, and Debtor's purported violation of a non-compete agreement.  As explained below, the litigation became quite contentious—with a state court judge going so far as to call it "rancid."  This court heard live testimony of two witnesses and was presented with 18 exhibits.  Post-hearing briefing was submitted on May 26, 2023.  This court has determined that the prepetition debt owed by the Debtor to the Plaintiff, imposed pursuant to a final order of a Georgia state court, is excepted from discharge pursuant to section 523(a)(6). The court issues these Findings of Fact and Conclusions of Law in support of this decision, pursuant to Fed. R. Bankr. Pro. 7052.  Any Finding of Fact that should more properly be characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## I.    FINDINGS OF FACT

1.    The entity known as We Sell Restaurants, Inc. ("We Sell" or the "Plaintiff"), is a Georgia corporation.  It is a national restaurant brokerage firm and, specifically, markets restaurants to the public and brokers the sale and/or lease of restaurant space for clients. Its founder and CEO, Robin Gagnon ("Ms. Gagnon"), credibly testified that the company started in 2001 and conducts business in 45 states.

2.      Mr. Dominique Lydell Maddox, the Chapter 7 Debtor ("Maddox" or the "Defendant"), while residing in the state of Georgia, was retained by the Plaintiff as an independent contractor from September 2010 to December 2013, then left the company, then came back again from January 2015 to October 2019. Maddox's responsibilities as an independent contractor included, without limitation: soliciting clients, cultivating client relationships, and working to sell, lease, and/or manage restaurant businesses listed with the Plaintiff. Maddox testified that he worked as a "restaurant broker" and for a small amount of time as a "sales development manager."

3.      Ms. Gagnon credibly testified that, to protect the Plaintiff's trade secrets and proprietary systems and such, the company requires its independent contractors to sign a non-compete agreement. What is this proprietary information that the Plaintiff seeks to protect?  Data such as training manuals, handbooks, customer/client lists, lead lists, presentations, draft agreements, marketing materials, business/restaurant valuation tools, etc.   The form of non-compete agreement submitted into evidence referred to the Plaintiff as "Broker" and an independent contractor such as the Debtor as a "Licensee," and did, indeed, restrict or prohibit the Licensee's use of "Trade Secrets" and "Confidential Information" (both defined in the agreement). It further prohibited the Licensee from engaging in solicitation of clients or engaging in "Competitive Services."  The agreement defined "Competitive Services" as follows:

> activities, services or products competitive with the brokering and selling businesses and associated real property (if any), advising customers and clients with regard to site location for businesses, and provision of related consulting services, or any related activities, services or products of the type authorized, offered, provided or conducted by Broker or its affiliates within two (2) years immediately

3

prior to the cessation of Licensee's relationship with Broker or earlier measuring date, as applicable.[1]

The agreement further defined "Restricted Territory" as follows:

> (i) the entire metropolitan Atlanta area consisting of the following counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKall, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Hall, Haralson, Feard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Putnam, Rockdale, Spalding, and Walton and (ii) with respect to the area lying outside of the area described in (i) above, any area that lies within a fifteen (15) mile radius of any facility or location where Broker authorized, offered, provided or conducted Competitive Services within two (2) years immediately prior to the cessation of Licensee's relationship with Broker or earlier measuring date, as applicable."[2]

3.    In the fall of 2015, the Plaintiff updated its form of non-compete agreement. According to the credible testimony of Ms. Gagnon, the Plaintiff did so in order to comply with Georgia state law following an incident of some sort with another independent contractor.[3] We Sell offered into evidence a copy of a non-compete agreement that shows it was signed by the Debtor on August 29, 2015.[4]  In a nutshell, it prohibited Maddox from brokering or selling restaurants or providing services or products similar to that which We Sell provided for a two year period following termination of his relationship with We Sell. And Maddox was also prohibited from soliciting We Sell's current and prospective customers with whom he had material contact for the purpose of offering competitive services/products.   However, the Debtor took the position in prepetition

---

[1] Plaintiff's Exhibit 1 [Doc. 38], at p. 2.
[2] *Id.* at p. 3.
[3] Audio Transcript of May 15, 2023 Trial Hearing, at 10:21:10 a.m.
[4] Plaintiff's Exhibit 1 [Doc. 38].

4

litigation,[5] and still to this day, that he did not sign the non-compete agreement, and that his signature is a forgery.

4.      In the first quarter of 2019, while still an independent contractor with the Plaintiff, the Debtor purchased a URL with the name "EatsBroker.com." The Debtor confirmed this in testimony.  He further testified that he did not immediately set up a webpage utilizing this URL. Maddox also testified that he personally obtained his own broker's license around this same time. Then, on October 14, 2019, Maddox notified Ms. Gagnon that he intended to leave We Sell and open a competing restaurant brokerage firm at the end of 2019. Ms. Gagnon told Maddox that doing so would be in violation of his non-compete agreement. Maddox maintained that he nonetheless planned on establishing a competing brokerage business. Ms. Gagnon immediately terminated Maddox's independent contractor relationship with We Sell and revoked his password and all access to We Sell's software, database, and other resources containing confidential, proprietary, and trade secret information. Maddox opened his own restaurant brokerage business shortly thereafter.

5.      Just a few days later, on October 25, 2019, Maddox received from the Plaintiff's legal counsel a notice to immediately cease-and-desist violating his non-compete agreement.[6] Ms. Gagnon credibly testified that We Sell made the decision to send this letter after becoming aware that Maddox was advertising and promoting his competing business, and that at least one We Sell client (a Mr. Wang of "Senor Buddha") utilized the Debtor's personal brokerage services on a

---

[5] Defendant's Exhibit D, pp. 5-7.
[6] Plaintiff's Exhibit 3 [Doc. 38].

transaction after Mr. Wang terminated his listing agreement with We Sell.[7] Maddox did not respond to the cease-and-desist letter and continued to operate his new business. In fact, on November 6, 2019, Maddox posted on social media that he had received his broker's license and was ready to take clients.

6.      On November 13, 2019, We Sell filed a complaint in the Superior Court for Fulton County, State of Georgia (the "Georgia Court") against Maddox and his new entity Eats Restaurant Brokers, LLC, seeking damages, declaratory relief, and a temporary injunction,[8] to which Maddox answered through counsel.[9]

7.      The complaint alleged breach of the non-compete agreement and misappropriation and conversion of proprietary information, confidential information, and trade secrets, among other things.  On November 22, 2019, the Georgia Court granted a temporary restraining order ("TRO") stating, "that the specific facts alleged in Plaintiff's *Verified Petition* shows that immediate and irreparable injury, loss or damage will result absent an order to maintain the Parties' status quo."[10] The TRO ordered in relevant part:

> a.    Defendant shall not provide competitive services of brokering and selling any business and associated real property, advising customers and clients with regard to site location for any businesses, and/or provision of related consulting services, or any related activities, services or products of the type authorized, offered, provided, or conducted by Plaintiff within two (2) years immediately prior to Defendant's termination, within the restricted territory of the entire metropolitan Atlanta area and any area that lies within a fifteen (15) mile radius of any facility or location where Plaintiff authorized, offered, provided, conducted competitive services within two (2) years immediately prior to Defendant's termination.

---

[7] Audio Transcript of May 15, 2023 Trial Hearing, at 10:06:37 a.m.
[8] Plaintiff's Exhibit 2 [Doc 38].
[9] Defendant's Exhibit D.
[10] Defendant's Exhibit C, at p. 1.

    b.    Defendant shall not solicit or attempt to solicit, directly or indirectly, any business from any of Broker's customers or clients, or Broker's actively sought prospective customers or clients, with whom Plaintiff had material contact during his relationship with Defendant, for the purposes of providing or offering competitive services as defined in subsection (1) above.

    c.    Defendant shall not use or disclose any of Plaintiff's confidential information and/or trade secrets, including customer or lead contacts and information, training manuals, business practices, procedures, and methods of Plaintiff with respect to the provision of its services, except for use or disclosure that is required by applicable law or court order.

    d.    Defendant shall not solicit or induce any employee or independent contractor of Plaintiff with which Defendant had meaningful contact within 12 months prior to his termination to terminate such employee's or independent contractor's relationship, employment, or engagement with Plaintiff and/or to enter into an employment or independent contractor relationship with Defendant or any other person or entity with whom Defendant is associated. [11]

7.    The TRO further set a hearing for December 18, 2019, on Plaintiff's request for interlocutory injunctive relief.[12]

8.    On December 23, 2019, the Georgia Court entered a "Consent Temporary Order," signed by both counsel for Plaintiff and Defendant, extending certain provisions of the TRO, including a provision restricting Defendant from soliciting (or attempting to solicit) any of Plaintiff's customers or prospective customers with whom he had material contact during the two (2) years prior to his termination.[13]

9.    Here's where things get especially contentious. The undisputed record showed that, throughout the pendency of the prepetition litigation, Maddox refused to participate in discovery and made what appears to have been an unfounded criminal allegation against Ms. Gagnon that

---

[11] *Id.* at pp. 1-2.
[12] *Id.* at p. 2.
[13] Defendant's Exhibit E, at p. 1.

she had forged his signature on the non-compete agreement. Ms. Gagnon was required to retain criminal counsel and a handwriting/forgery expert witness at significant expense. Maddox ultimately did not pursue the criminal complaint of forgery. Maddox also made an allegation of witness tampering against Ms. Gagnon.

10.     This is all described in extensive detail by the Georgia Court in its Order Striking Answer and Imposing Permanent Injunction, dated October 29, 2020 ("Permanent Injunction Order").[14] Among other things, it details how the Plaintiff began serving comprehensive discovery on the Defendant on February 11, 2020, which was mostly ignored. The Georgia Court held conference calls at various points to attempt to resolve the discovery disputes. The Defendant made allegations of witness-obstructionism on the part of the Plaintiff as well as allegations of the forged non-compete agreement, but the Defendant never produced evidence of either. The Georgia Court issued an "Order Granting Plaintiff's Motion to Compel" on August 7, 2020, that was apparently not complied with by Defendant. The Georgia Court entered a September 24, 2020 Order which found that the Defendant was "dilatory and obstructive in [his] responses to discovery."[15] The Defendant also apparently failed to preserve or produce communications even after he was ordered to produce them. The Georgia Court stated that this amounted to: "Wilful abuse of the discovery processes for which sanctions are appropriate."[16] In explaining this, the Georgia Court describes a

---

[14] Defendant Exhibit H.
[15] *Id.* at 3 & 4.
[16] *Id.* at 3.

timeline of events and orders that it entered regarding discovery efforts by Plaintiff and repeated noncompliance by Defendants.[17]

11.    In the Permanent Injunction Order, the Georgia Court further found that the Plaintiff had established a legitimate business purpose to support its restrictive covenants in the non-compete agreement and that its provisions were in compliance with Georgia law.[18]   The court entered a permanent injunction and set a hearing for a later date to hear evidence of damages and a request for attorney's fees and costs.[19] Maddox defied the Georgia Court's temporary, and later permanent, injunction and continued to operate his business, including brokering the sale of "Cans Taqueria" on June 1, 2020, and "Hungry Howie's Pizza" on October 31, 2020.[20]

12.    On August 18, 2021, the Georgia Court awarded Plaintiff $246,245.02 of attorney's fees reimbursement against Maddox as its damages (the Plaintiff did not put on evidence or seek other damages—apparently because of the lack of receipt of discovery responses to assess other damages), finding and concluding that Maddox's "willful and intentional" and "unfounded, harassing and delaying tactics" were "the very definition of 'substantially frivolous, substantially groundless, and substantially vexatious" ("Georgia Final Order"). [21] The court further noted "for the record the broader issue at hand which is the rancid atmosphere created by Defendant that permeated this litigation and was obvious to [the] court."[22] The court noted that $192,088.74 of

---

[17] *Id*. at p. 3.
[18] *Id.* at p. 5.
[19] *Id.* at pp. 6-7.
[20] Defendant's Exhibits F & G.
[21] Defendant's Exhibit I, at p. 3.
[22] *Id.* at p. 1.

fees had been incurred by the Plaintiff in defending Defendant's "eventually unsubstantiated claims of forgery and witness harassment" and another $11,045.24 in "expert fees and travel expenses for having to defend against Defendant's specious forgery claims."[23]

13.     Following the Georgia Final Order, Maddox relocated to Texas where he continued to operate a restaurant brokerage business.

14.     Maddox rebranded EATS Restaurant Brokers to EATS Brokers in 2021.

15.     On March 21, 2022, Maddox filed a chapter 7 bankruptcy petition in the Northern District of Texas, Dallas Division.

16.     On June 13, 2022, We Sell filed a complaint to commence this Adversary Proceeding.

17.     On June 15, 2022, Maddox received a chapter 7 discharge.

## II.     CONCLUSIONS OF LAW

1.     Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a statutory core proceeding, pursuant to at least 28 U.S.C. § 157(b)(2)(I); thus, the bankruptcy court has statutory authority to enter a final order.  To the extent there is any dispute regarding the core nature of the claims in this Adversary Proceeding, the court deems the parties to have consented to final adjudication by the bankruptcy court.

2.     This court has determined that it has constitutional authority to enter a final order in this matter. Venue is proper before this court, pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[23] *Id.* at p. 2.

3.      We Sell has standing to bring this objection to discharge against Defendant.

4.      The Bankruptcy Code is designed to relieve debtors from the weight of oppressive indebtedness and to provide them with a "fresh start."[24] This "fresh start" is available only to the "honest but unfortunate debtor."[25]

5.      Not all debts owed by an individual debtor are discharged in bankruptcy. Certain debts, listed in section 523, are excepted from discharge. In actions to exempt such a debt from a debtor's discharge, the plaintiff has the burden of establishing all elements of a section 523 exception to discharge by a preponderance of the evidence.[26] Exceptions to discharge are to be construed strictly against creditors and liberally in favor of debtors.[27]

6.      Section 523 states in relevant part that:

(a) A discharge under § 727, 1141… of this title does not discharge an individual debtor from any debt –

>       (2) for money, … to the extent obtained by... false pretenses, a false representation, or actual fraud…

>       (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny,

---

[24] *In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995).
[25] *Grogan v. Garner,* 498 U.S. 279, 287, 111 S. Ct. 654, 659, 112 L.Ed.2d 755 (1991); *In re Fegeley,* 118 F.3d 979, 983 (3d Cir. 1997); *In re DeBaggis,* 247 B.R. 383, 388 (Bankr. D.N.J. 1999).
[26] *Grogan,* at 287-88, 111 S. Ct. at 659-60.
[27] *Cohn,* at 1113.

(6) for willful and malicious injury by the debtor to another entity or to the Property

of another entity.[28]

7.      We Sell filed this Adversary Proceeding objecting to the discharge of the debt owed

to it by Debtor, pursuant to the Georgia Final Order, under 11 U.S.C. § 523(a)(2), (4), and (6).

The purpose of non-dischargeability under these sections is to prevent the abuse of bankruptcy

remedies by those who had knowingly and deliberately harmed their creditors.

8.      Plaintiff argues that as a consequence of his bad actions, Defendant Maddox should

not be entitled to discharge of the judgment debt awarded in the Georgia Final Order.

9.      During its closing argument at trial on May 15, 2023, Plaintiff admitted that

section 523(a)(6) formed the crux of its argument and that sections (a)(2) and (a)(4) were more

or less extraneous. Accordingly, this court will focus the majority of its attention on the

application of section 523(a)(6) to the facts and circumstances of the present case.

10.     Nothing in evidence supports a finding of nondischargeability under section

523(a)(2); counsel for Plaintiff characterized its inclusion in the Amended Complaint as

something akin to the proverbial kitchen sink approach. Consequently, the court will not discuss

it here.

11.     However, the court will briefly address section 523(a)(4), as unlike (a)(2), it could

conceivably provide a basis for nondischargeability.

---

[28] 11 U.S.C. § 523.

12.     Plaintiff puts forth two theories concerning nondischargeability under section 523(a)(4). First, it asserts that the broker/licensee arrangement between Defendant and Plaintiff created a fiduciary relationship of the kind required under section 523(a)(4), which Defendant then breached through fraud or defalcation. Second, Plaintiff asserts that Defendant converted or embezzled property that belonged to Plaintiff.[29] Plaintiff, therefore, concludes that the judgment debt issued by the Georgia Court is the result of fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

13.     Defendant was hired as an independent contractor of Plaintiff. Under Georgia state law, an *agency* relationship arises when one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.[30] Thus, as a broker/licensee for Plaintiff, Defendant was undoubtably an agent of Plaintiff. The question is, was Defendant also a *fiduciary*?

14.     The Bankruptcy Code does not define fiduciary. Whether a fiduciary relationship exists for section 523(a)(4) purposes is a question of federal law.[31] Under federal law, consistent with the principle that exceptions to discharge are to be narrowly construed, the concept of fiduciary under section 523(a)(4) is narrower than it is under general common law.[32] If applicable nonbankruptcy law does not clearly and expressly impose trust-like obligations on a party, the

---

[29] Amended Complaint [Doc. 11], at p. 22.
[30] Ga. Code Ann. § 10-6-1 (2010).
[31] *Gupta v. Eastern Idaho Institute Inc* (*In re* Gupta), 394 F. 3d 347, 350 (5th Cir. 2004).
[32] *Texas Lottery Comm'n v Tran (In re* Tran*)*, 151 F .3d 339, 342 (5th Cir. 1998).

court will not assume that such duties exist and will not find that there was a fiduciary relationship.[33]

15.    Another court in this district has held that "a debtor is not a fiduciary within the meaning of section 523(a)(4) when the debtor is merely in the position of an agent, bailee, broker, factor, partner or similarly situated person ***unless some additional fact is shown*** (emphasis added)."[34]

16.    In its Amended Complaint, Plaintiff argues that Georgia's Commerce and Trade Code creates a fiduciary duty as to agents on behalf of their principals.[35] Therefore, it concludes that as an agent of Plaintiff, Defendant owed Plaintiff a fiduciary duty. However, the code section Plaintiff cites to support this assertion, Georgia Code § 10-6B-14, refers to agents ***that have accepted appointment of power of attorney or delegation of fiduciary powers*** under paragraph (7) of subsection (a) of Code Section 10-6B-40.[36] Nothing in the record indicates that Defendant ever did so. Nor was Defendant an officer or director of Plaintiff. The presence of the broker/licensee arrangement and non-compete agreement, standing alone, are not sufficient to create a fiduciary duty on the part of Defendant.

17.    As a mere independent contractor, and in the absence of additional facts to support a finding to the contrary, Defendant did not owe Plaintiff a fiduciary duty. Consequently, he could

---

[33] *In re Fernandez-Rocha,* 451 F.3d 813 (11th Cir. 2006); *Johnson v. Woldman,* 158 B.R. 992 (N.D. Ill. 1993).
[34] *Bell v. Berry*, (*In re Berry),* 174 B.R. 449, 454 (Bankr. N.D. Tex. 1994) (J. Akard).
[35] Amended Complaint [Doc. 11], at p. 22.
[36] Ga. Code Ann. § 10-6B-14 (2010).

14

not have committed "fraud or defalcation while acting in a fiduciary capacity," as required by section 523(a)(4).

18.     In section 523(a)(4), the term "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny": any debt resulting from embezzlement or larceny falls within the exception of clause (4).[37] In short, this portion of section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and, therefore, a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

19.     Accordingly, the next inquiry under section 523(a)(4) is whether, in the alternative to breaching a fiduciary duty through fraud or defalcation, Defendant committed embezzlement by converting Plaintiff's property, as alleged by Plaintiff. Plaintiff argues that Defendant wrongfully misappropriated We Sell's Trade Secrets, confidential customer lists and proprietary systems, utilizing such items to advance his own business.[38] According to Plaintiff, such actions constituted conversion (and, thus, embezzlement), sufficient to except the damages under the Georgia Final Order from discharge.

20.     A conversion of personal property occurs upon the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the

---

[37] *In re Booker*, 165 B.R. 164 (Bankr. M.D.N.C. 1994); *see also In re Brady*, 101 F.3d 1165 (6th Cir. 1996); *In re Littleton*, 942 F.2d 551 (9th Cir. 1991).
[38] Amended Complaint [Doc. 11], at p. 22.

exclusion of, or inconsistent with, the owner's rights.[39] Ms. Gagnon credibly testified that Defendant illicitly took legal documents, company training manuals, and customer and lead information that properly belonged to Plaintiff upon his termination, later using these materials to create a competing business and pursue the same customers and transactions that Plaintiff would.[40] Plaintiff points to two sales, Cans Taqueria and Gator Pizza, that Defendant closed after his departure, presumably through use of the misappropriated property of Plaintiff.[41] If true, such actions on the part of Defendant could conceivably constitute conversion.

21.    As noted above, in actions to exempt such a debt from a debtor's discharge, the plaintiff has the burden of establishing all elements of a section 523 exception to discharge.[42] This court was not offered any proof *other than Ms. Gagnon's testimony* that Defendant actually took Plaintiff's customer lists, policy manuals, forms, training manuals, trade secrets or intellectual property. Nor was the court presented with the cell phone records that Plaintiff obtained during the Georgia State Court litigation that allegedly showed Defendant had used Plaintiff's confidential lists to call Plaintiff's customers and leads. Although Ms. Gagnon testified credibly overall, this oral testimony alone was not enough to establish the requisite elements of 523(a)(4) by a preponderance of the evidence.

22.    Therefore, Plaintiff's belief and testimony that Defendant must have embezzled property belonging to Plaintiff is not sufficient to except the debt under the Georgia Final Order

---

[39] *In re Edmonds,* 2019 Bankr LEXIS 3053* (Bankr. N.D. Tex. 2019).
[40] Audio Transcript of May 15, 2023 Trial Hearing, at 10:02:53 a.m.
[41] Proposed Joint Pre-Trial Order [Doc. 31], at p. 14.
[42] *Grogan,* at 287-88, 111 S. Ct. at 659-60.

from discharge under section 523(a)(4). The phone records or some other tangible evidence might have been persuasive to corroborate Ms. Gagnon's belief on this.

23.    Lastly, the court turns to section 523(a)(6). Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." A debt arising from the ***mere unlawful*** conversion of the property of another is not specified as nondischargeable in section 523(a), because "willful and malicious injury" covers a "willful and malicious conversion."[43]

24.    Section 523(a)(6) uses the word "entity" instead of "person" because the former is broader than the latter. "Entity" includes a person, estate, trust, and a governmental unit;[44] "person" includes an individual, partnership, and corporation, such as Plaintiff.[45]

25.    Section 523(a)(6) generally relates to torts and not to contracts; by its terms, it may apply to a broad range of conduct causing harm to people or property, subject to the limitation that the injury be "willful and malicious."[46] To fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. The requirements of "willfulness" and "maliciousness" are distinct requirements in the statutory text and are usually treated as such by the courts.[47]

---

[43] 124 Cong. Rec. H11,095–11,096 (daily ed. Sept. 28, 1978), *reprinted in* App. Pt. 4(f)(iii) *infra*; S17, 412–13 (daily ed. Oct. 6, 1978), *reprinted in* App. Pt. 4(f)(iii) *infra*.

[44] *See* 11 U.S.C. § 101(15).

[45] *Id*. at 101(41).

[46] *Lockerby v. Sierra*, 535 F.3d 1038 (9th Cir. 2008); *Cadillac Vending Co. v. Haynes*, 19 B.R. 849 (Bankr. E.D. Mich. 1982); *see also In re Riso*, 978 F.2d 1151 (9th Cir. 1992).

[47] *See Patch v. Patch* (*In re Patch*), 526 F.3d 1176 (8th Cir.2008); *Carrillo v. Su* (*In re Su*), 290 F.3d 1140 (9th Cir. 2002). *But see Williams v. Int'l Brotherhood of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (11th Cir. 2003) (quotations omitted) ("The test for willful and malicious injury under Section 523(a)(6) … is condensed into a single inquiry of whether there exists either an objective substantial certainty of harm or a subjective motive to

26.     In the absence of personal animus, it is not entirely clear, however, what type of wrongful conduct rises to the level of being "malicious" within the meaning of the subsection. One court has observed that there has been surprisingly little judicial and scholarly commentary discussing the degree or nature of "wrongfulness" that constitutes "malice" and suggested that the totality of the circumstances should be considered in determining whether a wrongful act rises to the level of being "malicious" within the meaning of the subsection.[48]

27.     In *Kawaauhau v. Geiger*, the Supreme Court held that negligent or reckless conduct does not constitute "willful and malicious" conduct and does not fall within the section 523(a)(6) exception to discharge. In affirming the court of appeals, the Supreme Court held that the section 523(a)(6) exception to discharge is limited to conduct which may be classified as "intentional torts" and does not encompass conduct which is merely negligent.[49]

28.     While some of the language in *Geiger* suggests that the section 523(a)(6) discharge exception may be limited to cases in which the debtor had the specific intention of causing injury, the Court did not define the precise state of mind required to satisfy the "willful and malicious" standard. Indeed, the Court's citation with approval of *McIntyre v. Kavanaugh* suggests that a specific intent to injure is not necessary.[50]

---

cause harm on the part of the debtor"). *See generally Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (surveying circuit court decisions defining the term "willful and malicious" and describing them as "all over the lot").

[48] *See In re Bressler*, 387 B.R. 446 (Bankr. S.D.N.Y. 2008).
[49] 523 U.S. 57, 118 S. Ct. 974 (1998).
[50] 242 U.S. 138, 37 S. Ct. 38 (1916).

29.    In *McIntyre v. Kavanaugh*, a case which held that a debt arising from the debtor's conversion of the creditor's property was excepted from discharge, the Court stated that a wrongful act, voluntarily committed with knowledge that the act is wrongful, and which necessarily causes injury, meets the "willful and malicious" standard.

30.    In analyzing whether this "willful and malicious" standard for the injury in question has been met, courts have opted for either an objective or subjective approach in making their determination. Most courts have adopted a purely subjective approach, requiring that the debtor desire the consequences of his or her conduct or, at least, subjectively believe that the injurious consequences are substantially certain to result from the conduct.[51]

31.    The Fifth Circuit, however, has espoused an alternative approach: the "willfulness" requirement is satisfied if there is either a subjective intent to cause injury ***or*** an ***objective certainty*** that the conduct will cause injury.[52]

32.    As mentioned above, the Supreme Court in *Geiger* rejected a broader construction of section 523(a)(6) that would make debts from intentional acts that cause unintended or unanticipated injuries nondischargeable. As an example of an intentional act resulting in unintended or unanticipated injury, the Court cited a knowing breach of contract.[53] With this brief mention of a knowing breach of contract, the opinion might at first glance appear to reject the

---

[51] *Panalis v. Moore* (*In re Moore*), 357 F.3d 1125 (10th Cir. 2004); *Carrillo v. Su* (*In re Su*), 290 F.3d 1140 (9th Cir. 2002); *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455 (6th Cir. 1999).
[52] *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598 1293 (5th Cir. 1998).
[53] *Geiger,* 523 U.S. at 62.

19

proposition that a debt arising from a knowing breach of contract is a willful and malicious injury excepted from discharge.

33.     However, the Fifth Circuit has construed *Geiger* to mean that a breach of contract is nondischargeable if either the subjective test or objective test for willfulness are met. Such a breach constitutes a willful and malicious injury if the debtor either intended to injure the other party to the contract by breaching it (the subjective intent approach adopted by other circuits) or if injury to the other party was substantially certain to result from the breach (objective certainty of outcome put forward by the Fifth Circuit).[54]

34.     In the present case, under the Fifth Circuit's approach, the dischargeability of the debt imposed by the Georgia Final Order depends on the intentional or certain nature of the injury inflicted upon Plaintiff.

35.     In answering this question, we must consider both Defendant's original breach of the non-compete agreement, as well as his conduct during the Georgia state litigation. Accordingly, we first look to the underlying breach.

36.     The record does not show that, when Defendant set up his own restaurant brokerage business in violation of his non-compete agreement with Plaintiff, he did so with any intention of injuring Plaintiff. Defendant testified that, prior to his departure from We Sell, he had had an amicable relationship with Plaintiff and Ms. Gagnon.[55] If anything, it would appear Defendant

---

[54] See *In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003); *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998); *Miller,* 156 F.3d at 606.
[55] Audio Transcript of May 15, 2023 Trial Hearing, at 11:13:00 a.m.

started his own company for financial gain and out of a desire to go into business for himself. The court has not been presented with any evidence to contradict this. Although Defendant acted intentionally, it is not apparent that he intended to injure Plaintiff.

37.     Whether Defendant's knowing breach of the non-compete agreement was substantially certain to injure Plaintiff is a more difficult question. It is certainly possible that, in starting a competing restaurant brokerage business, Defendant could have taken business away from Plaintiff. At trial, Ms. Gagnon discussed at length the importance of maintaining the integrity of her database and customer list, given the restaurant brokerage business is a service-based industry.[56] And Ms. Gagnon testified that Defendant's cell phone records showed he had repeatedly contacted Plaintiff's customers and points of contact.[57] However, as previously mentioned, *this court was not presented with the cell phone records in question, or any other incontrovertible proof that Plaintiff would assuredly lose customers as a result of Defendant's competitive actions*. Based on the evidence submitted to this court, it cannot be said that injury to Plaintiff was necessarily a substantial certainty of Defendant's breach of the non-compete agreement.

38.     Next, the court turns to the issue of Defendant's behavior *after* the commencement of the Georgia state court case. Specifically, the court is examining (1) the Defendant's violation of the Georgia Court's order compelling discovery, and (2) his violation of the Georgia Court's TRO, Consent Temporary Order, and Final Permanent Injunction.

---

[56] *Id*. at 9:50:28 a.m.
[57] *Id*. at 10:02:53 a.m.

39.     In its Final Permanent Injunction, dated October 29, 2020, the Georgia Court found that Defendant was in "willful contempt of the Court's August 7, 2020 order compelling discovery."[58] The court noted that, not only had Defendant failed to supplement the discovery order by the court, he also served nothing to support his allegations of forgery, witness tampering, and produced none of the communications he had been ordered to produce. In addition, the Georgia Court stated that Defendant "had not preserved his communications with his own witnesses or with any of [Plaintiff's] customers…despite [being reminded of his] obligations to preserve evidence."[59]

40.     The Georgia Court noted that Defendant's failure to respond to interrogatories and produce documents "constitute[d] willful disregard for this Court's Orders."[60]

41.     The Fifth Circuit has addressed the issue of state court sanctions for withholding or suppressing requested discovery as well as disregard for court orders in the 523(a)(6) context.[61] In *Scarborough*, a Texas state court sanctioned a future chapter 7 debtor for intentional withholding of recordings that had been requested in discovery, describing such behavior as actively deceptive discovery abuse.[62] The Fifth Circuit held that the sanction debt met the requirements of nondischargeability under section 523(a)(6), stating that the record reflected that the debtor had "intentionally concealed evidence…after multiple discovery requests were made, willfully

---

[58] Plaintiff's Exhibit 6 [Doc. 38], at p. 5, para. 17.
[59] *Id*. at p. 3, para. 9.
[60] *Id*. at p. 3, para. 16.
[61] *See Scarborough v. Purser*, 836 F.3d 447 (5th Cir. 2016).
[62] *Id*. at 451.

22

violated various court orders, and filed frivolous motions."[63] The court held that such actions necessarily impacted the litigation strategy of opposing parties, and, thus, constituted a willful and malicious injury under section 523(a)(6).[64]

42.     Like in *Scarborough*, the Georgia Court explicitly stated that Defendant failed to comply with the discovery process, even after being ordered to do so by the court. Such actions meet the requirements of section 523(a)(6).

43.     The Georgia Court also held that Defendant had failed to rebut the evidence of his failure to comply with the Court's *TRO* and *Consent Temporary Order*.[65]

44.     As a result of Defendant's actions, the Georgia Court found Defendant in contempt and ultimately imposed an award of attorney's fees and costs in favor of Plaintiff.  In explaining its award, the Georgia Court referred to the "specific, intentional, unfounded, harassing, and delaying tactics" of Defendant, which "amounted to the very definition of substantially frivolous, substantially groundless and substantially vexatious."[66]

45.     Finding Defendant's behavior "willful and intentional", the Georgia Court awarded $246, 245.02 in attorney's fees and costs to Plaintiff.[67] The Georgia Court broke down the award as follows:

---

[63] *Id*. at 453.
[64] *Id*.
[65] Plaintiff's Exhibit 6 [Doc. 38], at p. 6, para. 20.
[66] Defendant's Exhibit I, at p. 3.
[67] *Id*. at p. 4.

    a. $192,088.74 in fees for the litigation following the initial hearing in which Defendant's "unsubstantiated claims of forgery and witness tampering" were introduced.[68]

    b. An additional $43,110.37 in fees and expenses for Plaintiff's pursuit of the dismissal of an appeal that the Georgia Court stated was "clearly attributable to Defendant's failure to order [a] transcript on a timely basis and for arguing Defendant's insistence on a jury trial."[69]

    c. $43,110.37 in expert fees and travel expenses for resulting from Plaintiff having to defend against what the Georgia Court called Defendant's "specious" forgery claims.[70]

46.     When presented with the dischargeability of a judgment debt for violating a court order in *In re Williams*, the Fifth Circuit noted that "bankruptcy courts have held that a contempt judgment against a debtor in bankruptcy is immune from discharge under section 523(a)(6)."[71] In explaining their reasoning for holding the debt in *Williams* nondischargeable, the court stated that "failure to obey a court order constitutes willful and malicious conduct, and a judgment against a

---

[68] *Id*. at p. 2, para. 4.
[69] *Id*. at p. 2, para. 5.
[70] *Id*. at p. 2, para. 6.
[71] *Williams*, at 512.

defiant debtor is excepted from discharge."[72] It categorized contempt as "an act resulting in intentional injury."[73]

47.     The Fifth Circuit continued by quoting the bankruptcy court for the Western District of New York: "When a court of the United States . . . issues an injunction or other protective order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order as is proven either in the Bankruptcy Court or, so long as there was a full and fair opportunity to litigate the questions of volition and violation, in the issuing court are ipso facto the result of a 'willful and malicious injury.'"[74]

48.     The *Williams* court further cited the bankruptcy court's rationale for this conclusion: "This is because what is 'just' or 'unjust' conduct as between the parties has been defined by the court...an intentional violation of the order is necessarily without 'just cause or excuse' and cannot be viewed as not having the intention to cause the very harm to the protected persons that order was designed to prevent."[75]

49.     The Georgia Court's *TRO, Consent Temporary Order*, and *Final Permanent Injunction* clearly and unambiguously informed Defendant that continuing to operate his restaurant brokerage business was forbidden.

---

[72] *Id*., citing *PRP Wine Internat'l v. Allison* (*In re Allison)*, 176 B.R. 60, 64 (Bankr. S.D. Fla. 1994) (denying discharge to a debtor who continued to breach a non-competition clause in an employment agreement after a state court issued a temporary injunction).
[73] *Id*. at 512.
[74] *Id*. citing *Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn),* 242 B.R. 229, 238 (Bankr. W.D. N.Y. 1999).
[75] *Id*. at 512.

50.     The discovery orders apparently (according to the descriptions of the Georgia Court in the *Final Permanent Injunction*) likewise explained what documents and communications he was required to produce.

51.     Defendant was represented by counsel and knew of his obligations under the Georgia Court's orders, and he continued to operate his business anyway. Similarly, Defendant chose not to comply with discovery in the state court litigation despite that court ordering him to do so.

52.     Defendant's actions were done with full knowledge that they would violate the court orders, prolong the state court litigation, and result in Plaintiff's attorney's fees. Even if he did not *intend* to injure Plaintiff, the Georgia Court orders necessarily made Defendant substantially certain that such actions would injure Plaintiff. The attorney's fees awarded by the Georgia Court was a direct result of these actions by Defendant.

53.     Consequently, the debt incurred by Defendant as a result of his violation of the Georgia Court's orders is nondischargeable as a willful and malicious injury within the meaning of section 523(a)(6).

54.     In his post-trial brief, Defendant notes that, while prosecution of a frivolous claim or defense in federal court may result in sanctions being imposed on a litigant or his attorney, such conduct—without a specific showing of an intent to cause injury—cannot alone satisfy the requirement of section 523(a)(6).[76] Because the Georgia Final Order, awarding attorney's fees to

---

[76] *In re Wrem*, 791 F.2d 1542 (11th Cir. 1986); *see also Boyd v. Holmes* (*In re Homes*), 610 B.R. 541 (Bankr. S.C. 2020).

Plaintiff, does not provide specific findings that Defendant ***intended to harm*** Plaintiff, Defendant argues that the amounts awarded by the Georgia Court are dischargeable. He further notes that misplaced or misguided actions or beliefs are not sufficient to support a judgment under 523(a)(6).[77] Defendant has also suggested that the fact that only attorney's fees were awarded by the Georgia Court (as opposed to actual damages for business injuries caused by Defendant's conduct) precludes somehow application of section 523(a)(6). Note that Plaintiff opted not to put on evidence of actual damages to its business—it credibly states it had no ability to, since Defendant would not cooperate in discovery.

55.     Defendant points to another case in this district that dealt with a state court sanction that found the debtor had pursued "unsupported legal contentions" and exercised a "failure to exercise due diligence."[78] The court there held that this alone did not prove the debtor acted with objective substantial certainty of harm, or a subjective motive to cause harm necessary under section 523(a)(6). Moreover, the Defendant continues with his assertion that the non-compete agreement was a forgery and other defenses he put forth in state court—arguing the requirements of 523(a)(6) are not met; thus, he argues this debt to the Plaintiff should be discharged.

56.     If all that existed here was a state court sanction for Defendant's unsupported allegations of forgery and witness tampering, then the analysis here might be a bit more difficult. However, the Georgia Court's *Final Order* followed what it characterized as willful violation after willful violation of court orders. There was no ambiguity or room for question when it came to

---

[77] *See Burris v Burris* (*In re* Burris), 598 B.R. 315 (Bankr. W. D. Okla. 2019).
[78] *Vehicle Recovery Corp v. Lopez* (*In re* Lopez), 269 B.R. 607 (Bankr. N.D. Tex. 2001) (J. McGuire).

what the Georgia Court had commanded Defendant to do and not do. Defendant chose to cross the lines clearly laid out for him by the Georgia Court. As a result, his conduct in the state court action clearly meets the requirements of section 523(a)(6) as put forward by the Fifth Circuit, regardless of Defendant's lack of a subjective intent to harm Plaintiff.

### III.    CONCLUSION

In accordance with the above Findings of Fact and Conclusions of Law, the debt of $246,245.02 in attorney's fees and costs owed by Defendant to Plaintiff, pursuant to the Georgia *Final Order* shall be, and hereby is, excepted from Defendant Maddox's chapter 7 discharge under section 523(a)(6).

All relief requested by Defendant is denied.

All relief not expressly granted herein is denied.

Plaintiff is instructed to upload a form of Judgment of Non-dischargeability consistent with these Findings of Fact and Conclusions of Law.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**